By the Court.
Sandford, J.
The court charged the jury, that every steam-vessel, navigating the Hudson River, is bound at night to carry two lights, in the usual manner; that the omission to show two lights was a decided act of negligence, and if the propeller were guilty of it, and the collision were justly attributable to that cause, the defendants were liable. This presents the principal question in the case. The jury undoubtedly found that the collision was occasioned by the propeller’s omission to carry more than one light, and we see *506 no reason to find fault with their conclusion upon the evidence.
The provision of the state law on the subject is found in a title of the revised statutes, entitled, “ Of the navigation of rivers and lakes, and the obstruction of certain waters.” The eighth section is as follows: “Whenever any steamboat shall be navigating in the night time, the master of such boat shall cause her to carry and show two good and sufficient lights, one of which shall be exposed near her bows, and the other near her stern, and the last shall be at least twenty feet above her deck.” This enactment was originally made in 1826. (1 R. S. 684; Laws of 1826, p. 253, §§ 3, 4.) The necessity for such a regulation, in the crowded channel of the Hudson, was abundantly shown by the evidence on the trial.
The defendants contend, first, that the hybrid class of steam-vessels, designated as propellers, are not steamboats within the meaning of this statute; that the act was designated for steamboats as then known, constructed with side paddles, and moved solely by steam, and does not apply to vessels propelled by sails as well as steam, using stern submerged paddles or screws ; and that such steam vessels were not known when the revised statutes were adopted. We do not think this argument has any weight. A vessel propelled by steam is a steamboat within the meaning of the act, whether the power be applied in one part of the vessel or another, and whether the vessel uses the auxiliary power of sails, or relies solely upon steam. The propellers attain a high rate of speed, and are as dangerous at night to other craft navigating the river, in proportion to their relative speed, as the large passenger steamboats running from sixteen to twenty miles an hour. They are clearly within the letter as well as the spirit of the law.
The great point of the defence is, that the propeller was not bound to carry more than one light, because she was a vessel owned in another state, navigating a river subject to the jurisdiction of Congress, under a national enrolment and license. The act of Congress of July 7, 1838, (Ch. 191, of acts of C. 1838, page 171, § 10,) makes it the duty of the master and *507 owner of every steamboat running between sunset and sunrise, to carry one or more signal lights, that may be seen by boats navigating the same waters, under the penalty of two hundred dollars. It is contended that under this act .the propeller was not bound to carry more than one light, and if she complied in that respect with the act of Congress, she was fully and properly equipped; whereas the court instructed the jury that the act of Congress did not affect the state law on the subject.
The defendants argue that no one state has a right to prescribe the fitments necessary for a coasting vessel from another state coming into its waters; nor pass laws regulating or prescribing commerce and navigation between its own territories and those of other states; that its power over these subjects is restricted to its own inland commerce: that the state law requiring two lights upon steamboats navigating our waters is clearly an act regulating navigation, and therefore void as to coasting steamboats licensed and navigating under the laws of Congress; and Ogden v. Gibbons, 9 Wheat. 189, and the Passenger Oases, (7 Howard’s U. S. R. 283, 311, 423, and 435,) were relied upon as decisive authorities in favor of the defendants.
This point presents the long vexed question as to the extent to which the respective states may go, in enacting laws which directly or incidentally regulate commerce. The constitution of the United States has given to Congress the power “to regulate commerce with foreign nations, and among the several states, and with the Indian tribes.” It is agreed that navigation, from one state to another, is commerce, within the meaning of the constitution. It is still an open question whether this power is so far exclusive as to make void all state legislation which regulates commerce or navigation, in matters not legislated upon by Congress, though the weight of authority is that such legislation is valid. (Passenger Cases, 7 Howard, 399, 430, 471, 488, 498, 545, 554; License Cases, 5 Howard, 504, 581, 583.) A solution of that question, in favor of the state authority, would not relieve this case, because, since the revised statutes, Congress has legislated upon it by the act of 1838. Judge Woodbury, in his able and elaborate opinion in *508 the Passenger Cases, p. 557, claims a concurrent power in respect of commerce on the rivers between different states. We do not feel at liberty, however, to repose our judgment solely on that general ground.
There are some regulations which have been conceded, or clearly established, in favor of state legislation. Such are the laws imposing health, quarantine, and harbor regulations and restrictions, those regulating inspections, sales by auction, and the preservation of vessels and property wrecked, and the laws respecting pilots and pilotage. Acts of Congress recognize and enforce some of these laws; and the state pilot laws are often referred to as standing by force of the act of Congress of 1789; but it is difficult to understand how that act can support the multitude of pilot laws enacted by the different states since its passage. Except the act of Congress of 1837, so far as it bears on the subject, almost the entire mass of pilot laws in this Union rests upon the unsupported validity of the state laws. (See 5 Howard, 580.)
All of these classes of state laws to which we have referred, affect commerce more or less directly. Many of them directly regulate navigation, both foreign and between the states; they have been sanctioned, or silently acquiesced in, on the ground that they are police regulations, ordained under the power which every state of necessity retained for its self-preservation, in the distribution of legislative power between the states and the general government. The definition of police powers is not clearly ascertained in those cases where they have been considered by the supreme court of the United States. A broad legal definition of the term embraces all legislation for the internal regulation and domestic order of the state. (4 Bl. Com. 162.) In 5 Howard, 583, Chief Justice Taney says, the police powers of a state are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominion. Another learned judge observed, that the police of the ocean belongs to the general government, but not that of the harbors and the land. (5 Howard, 471; 7 Ibid. 523.) The subject was much discussed by the judges of the *509 supreme court in the Passenger Cases, as well as in many prior cases in that court; but the line of distinction between laws affecting commerce, which are within the police powers of the respective states, and those which, assuming to operate within the states, trench upon the authority of Congress under the constitution, is still vaguely marked.
If any principle may be deduced from the decisions and the opinions of the judges of that high tribunal, it is this — that each state may pass such laws affecting commerce, to operate within its own limits, not in direct conflict with the provisions of the constitution of the United States or acts of Congress, as are necessary for the preservation of the life, the health, the personal rights, and the property of its citizens, and of those enjoying its protection. To that extent, it appears to us, the municipal laws of the respective states must be valid, whether they be called police laws, or by any other name.
The state laws regulating vessels in ports and harbors, pilot-age, and the quarantine of vessels, cargoes, and passengers, are very striking illustrations of this principle; and of the same character, and clearly falling within the principle, is the act of the legislature of this state, regulating the navigation of our rivers and lakes. It was indispensable to provide, by stringent enactments, for the safety of lives and property, when so powerful an element as steam came to be in common use in our narrow rivers and crowded inland waters. Hence the passage of the act of 1826, continued in force and extended by the revised statutes. The statute prescribes, among other things, that steamboats navigating our waters shall, on meeting, pass each other to the starboard side; that on passing each other, when going in the same direction, they shall leave a space of twenty yards between them; that they shall carry and show two lights when navigating in the night; that the engines shall be stopped while passengers are landing or being received on board, and the like; and in respect of Lake Champlain and the Hudson River, all vessels at anchor, in the night, shall show a light in their rigging twenty feet above the deck.
All these are regulations manifestly proper, and indeed neces *510 sary, for the preservation of life and property; and if they do not come within any decision, as a police power of the state, ■they clearly fall within the principle which we have endeavored to extract from the nature of the subject, and the authorities bearing upon it.
It may be argued, however, that the particular provision in ■question cannot stand, because it adds to the requirement of the act of Congress, and is thus directly in conflict with it; the latter saying that a steam vessel may navigate with one light, •while the state law says that it shall not navigate with less than two.
We answer, that the addition of a further qualification, is not in direct collision with a law prescribing the first qualification. The act of Congress does not provide that it.shall be sufficient for a steamboat navigating at night to be equipped with one light only, or that, if so equipped, she shall be at liberty to navigate in all waters, whether inland or on the coast. Licensed steamboats derive their right to navigate from state to state, not under this act of 1838, but under the various navigation acts passed by Congress. A compliance with the provisions of the acts of Congress, does not exonerate licensed vessels from observing the local laws and usages which require further equipments in particular waters for the protection of all vessels navigating those waters. The act of Congress of 1838 requires certain safeguards to be observed by steamboats; one of which is, that they shall show at night at least one light. A state, finding those safeguards insufficient, within its waters, adds .others which are necessary to preserve life and property. There is no direct conflict. The act of Congress has full scope in waters not within a state, and alone governs in inland waters as well as those, except where the police regulations of a state, operating within the state, require additional precautions. There, a steamboat carrying only one light, escapes the penalty of the act of Congress, but may be subject to pay for an injury occasioned by her omission to comply with the municipal regulations of the state.
To the extent of the implied conflict between the two laws, *511 arising from the addition of further equipments by the state •law, it is clear to us the municipal law of the state must govern. In respect of matters touching commerce, which are plainly 'within the concurrent authority of the states, as being police regulations, it seems to us that the paramount duty of every . government to provide for the security of life, to say nothing of property, must determine the point in favor of the state laws, when they add to the congressional requirements. If this were otherwise, a system of unwise, or what is not supposable, perverse legislation by the national government, might soon depopulate our prosperous city with imported pestilence, strew our coast with the wrecks of unskilfully piloted vessels, and fill our noble Hudson with the hulks of steamboats and river craft destroyed by collisions.
The same principle that would, on this ground, overturn the statute of the state involved in this cause, would destroy all • laws regulating pilotage and quarantine, which go beyond what Congress deems proper at any time to enact on those subjects.
It was argued by the defendants’ counsel that the effect of a statute of the state was different from that of a usage of navigation. But wherein is the difference ? A usage of navigation, peculiar to the Hudson’ river, for example, has prevailed twelve years, when an act of Congress, relative to the coasting trade, prescribes a rule on -the same subject, widely different, though not directly in conflict with the usage. The latter, so far as it has any force, has it as a portion of the unwritten municipal law of the state; and if the legislation of Congress, adopted after a state statute, make void the latter so far as it adds to or differs from the congressional rule, how can the unwritten law :escape the same consequence? It seems to us that both alike -must give way, unless they can stand' as a part of the internal police of the state, the control of which always remained in the state governments.
In matters upon which Congress has-not legislated, the courts of ’the United States in this district and circuit, adopt the state •law, recognizing the statutes of the state and the established usages of navigation as valid. Since the argument of this cause, *512 we have observed two decisions of the very learned and experienced district judge to this effect. (Judge Betts’s Decisions in Admiralty, March 11, 1851.) In one of them, Vandewater v. Westervelt, a case of collision in the East river, the state act of April 12, 1848, was applied, and the judge remarked that the district court enforced the observance of the state law in navigating state waters. The other case, Van Pelt v. Steamboat Niagara, was also one of a collision in the East river, before the act of 1848. The court made the same observation in respect to a provision of the revised statutes of this state, heretofore cited, which requires vessels meeting on opposite courses to pass each other on the starboard side; and on that provision, as well as the maritime law, the libellant recovered damages.
When the libel of the propeller against the Santa Claus, for the collision in question in this suit, was before the courts of the United States, the enactment of the statute of 1826, and the revised statutes, relative to two lights on steamboats navigating at night, were not discussed or mentioned, as we are authoritatively informed. Judge Betts, in his opinion, alluded to the strong evidence given to show that unless there was a head light as well as a stern light, upon the propeller, there would be no means for vessels meeting her to know what direction she was taking; and he was inclined to hold that the omission of a forward light was negligence on the part of the propeller; but the state of the pleadings prevented the claimants from taking that ground.
When the case of the Santa Claus came up on appeal in the U. S. circuit court, the answer of the claimants had been amended, and further evidence was given. Judge Nelson said he regarded the proof clear, as it was in the district court, that the two lights were important to enable a vessel to discern the course of another approaching; and because the fact that the propeller had not a bow and stern light was calculated to mislead the Santa Claus as to her course, and thus, in part, occasioned the collision, he held that the Santa Claus was not responsible in damages.
We have referred to these judgments of the district and circuit courts, as showing the uniform application of the local law, *513 botb statutory and by usage, in matters directly affecting navigation. In tbe case of tbe Santa Claus, tbe omission to show two lights, though reposed on proof of its necessity instead of the statute of the state, was in the circuit court held decisive against the propeller, notwithstanding the act of Congress of 1838 was referred to in both courts, and was therefore considered by the respective judges. We are confident that the position of the Santa Claus in those courts would not have been weakened by a reference to the positive statute of the state, to the same effect as the practice proved to have been necessary, for the safety of vessels navigating our rivers in the night; and that the judges would have enforced the state law, if it had been brought to their notice. The practice of those courts in reference to the state laws, seems to warrant us in this conclusion, and to sanction the validity of such laws, to the extent which we have claimed for the statute bearing upon this case.
The question is one of governmental power, made difficult of solution by the nature of our state and confederated system. It should be cautiously and maturely considered, whenever it arises, both to give full effect to what is exclusive in Congress, and not to infringe upon legislation for matters within the respective states by them deemed essential for the welfare and protection of their citizens. When thus regarded, with a determination on all hands to avoid collisions between' the authority of the state and that of the general government wherever it is possible without a sacrifice of duty, cases of conflict will, we trust, be of rare occurrence. And we do not doubt that in this spirit, the state law involved in this case will be upheld in the federal courts, as well as in our own. ?
There was no error in the ruling of the judge on this subject at the trial.
A multitude of propositions were submitted to the judge at the trial, with a request that he would charge the jury conformably to them, and an exception was taken upon his omission so to instruct the jury. Some eighteen of these propositions were brought to our notice by the points made upon the argument. Those which relate to the act of Congress and the *514 amount of damages, we notice at large. As to all the others, it suffices to say that those not left to the jury, substantially as the defendants requested, were covered by the submission of the question of negligence on the part of the plaintiffs, in the sixth and seventh paragraphs of the charge.
The question of damages remains to be considered. The item of twenty-five dollars for the barber’s loss, was no part of the injury, either to the vessel or the owners, and was wholly inadmissible. The sum of nine hundred dollars, allowed for the detention of the Santa Claus, while she was undergoing repairs, is the principal disputed claim for damages.
The statute which authorizes the proceedings adopted in this case, (Laws of 1831, ch. 318, page 421,) provides that whenever a vessel, in a collision occasioned through the negligence or wil■ful misconduct of those navigating another vessel, shall thereby have sustained damage to the extent of fifty dollars, or upwards, the owner of the damaged vessel shall have a lien on the vessel which caused such damage, her tackle, apparel, and furniture, to the extent *of such damage. The bond which was given to discharge the warrant of attachment against the propeller, (Ibid., 2 R. S. 495, § 18,) was upon the condition that the obligors should pay the amount of such claim or demand as the plaintiffs should establish to have been subsisting liens upon the propeller, at the time of exhibiting the same to the officer who issued the warrant. The recovery must therefore be confined to the lien which the plaintiffs had upon the propeller, and that lien, by the literal terms of the statute giving the remedy, is the extent of the damage sustained by the plaintiffs’ steamboat, and not the extent of the injury sustained by the plaintiffs, the owners of the boat.
In the case of Finch v. Brown, 13 Wend. 601, this point came before the late supreme court, soon after the passage of the . act of 1831. The court held that in a suit on a bond, given precisely as this bond was given, the measure of damages was the actual damage to the vessel injured — that is, the amount necessary to repair and put her in as good condition as when the accident happened; and that the plaintiff could not recover for *515 the loss of earnings, or his other like damages, consequent upon the collision. The court said that the owner must look for these in an action on the case, as he might have done before the statute. A new trial was granted in that case, solely because the court was satisfied, from the amount of the verdict, that the jury gave damages for the loss of earnings, or other injury to the owner, in addition to the actual damage to the vessel. It is therefore a direct authority upon the question before us, and is decisive against the claim for the plaintiffs’ loss by the detention of their steamboat.
The other charges allowed by the jury, of which the defendants complain, were properly allowed as damages to the steamboat. ■ Thus, the charges for towing her from the place of the accident to New York, and' thence to the dry dock, were a necessary expense towards repairing the injuries she had sustained. So of the wharfage while the repairs were made. As to the charge marked “steward’s bill,” in the statement on which the jury noted their allowances, it appears in the evidence as “ furniture of-room,” and testified to by the captain as being among the repairs made to the Santa Claus.
The allowance of interest was also objected to. As to this, the jury are always at liberty to allow interest, in cases of this kind. In actions of assumpsit for not delivering goods on a bill of lading, or charter-party, interest is allowable, if there were any wrongful or improper conduct; and it is allowed on an unliquidated debt, payable at a fixed time, as upon rent payable in services and grain. (Van Rensselaer v. Jewett, 2 Comst. 135.) The amount of the plaintiffs’ lien upon the propeller, though not liquidated, was due and payable when the bond was executed; and we have no doubt they are entitled to recover interest upon dt from that date.
The verdict must be reduced according to the views above stated, pursuant to the reservation in the case, and the motion for a new trial is thereupon denied.
Judgment for the plaintiffs, for $2036.55, and interest from the date of the bond, June 9th, 1816.